**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

WILLIAM MEYER,

              Defendant.

No. 19-CR-105-CJW-MAR

**ORDER**

———————————

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................ 2

II.    STANDARD OF REVIEW.............................................................. 2

III.   FACTUAL BACKGROUND ........................................................... 6

IV.   ANALYSIS...................................................................................... 10

      A.     Probable Cause .................................................................... 10

      B.     Exigency .............................................................................. 14

      C.     Good Faith ........................................................................... 19

V.     CONCLUSION ............................................................................... 21

# I.    INTRODUCTION

This matter is before the Court on a Report and Recommendation ("R&R") (Doc. 34) of the Honorable Mark A. Roberts, United States Magistrate Judge.   On December 5, 2019, defendant filed a motion to suppress.   (Doc. 25).   On December 12, 2019, the government timely filed a resistance.   (Doc. 30).   On December 18, 2019, Judge Roberts held a hearing on defendant's motion.   (Doc. 31).   On January 23, 2020, Judge Roberts issued his R&R, recommending that the Court deny defendant's motion.   (Doc. 34).   The deadline for filing objections to the R&R was February 6, 2020.   On February 6, 2020, defendant filed both factual and legal objections to the R&R (Doc. 43) and the government filed only factual objections (Doc. 44).

For the following reasons, the Court **sustains in part** and **overrules in part** defendant's objections (Doc. 43), **sustains** the government's objections (Doc. 44), **adopts** Judge Roberts' R&R (Doc. 34) with modification, and **denies** defendant's motion to suppress (Doc. 25).

# II.    STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.   A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.   The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements).   While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.   Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not

> preclude further review by the district judge, sua sponte or at the request
> of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen de novo review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review."

*Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has concluded that general objections require "full de novo review" if the record is concise. *Id.* ("Therefore, even had petitioner's objections lacked specificity, a de novo review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate.").

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to FED. R. CIV. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and

recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard

appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III.   FACTUAL BACKGROUND

After reviewing the record, the Court finds that, except where noted, Judge Roberts accurately and thoroughly stated the relevant facts in his R&R.   (Doc. 34, at 2-6).   Thus, the Court adopts Judge Roberts' factual findings as set out below with modification.   (*See id.*)

The search and seizure of Defendant's computer towers, hard drive, and cell phone ("the devices") at the heart of this dispute occurred on July 3, 2019.   However, the investigation of Defendant commenced in 2017. In early 2017, Operation Dark Room was an ongoing investigation of livestream sex abuse of minor victims located in the Philippines.   (Ex. D ¶ 11.)   The FBI obtained information that Ann Marie Simbulas Santos [("Santos")] was involved in the production and distribution of livestream child pornography from the Philippines.   (*Id.* ¶ 12.)   The FBI identified an email address and PayPal account for Santos.   (*Id.*)

The FBI also obtained information about the Cruz family that lived near Santos and was also "tied to subjects investigated or arrested for sexually exploiting children."   (*Id.* ¶ 13.)   A Canadian citizen admitted to sending members of the Cruz family Western Union money transfers to purchase child exploitation images.   *Id.*   The FBI had learned that Marynel Cruz was associated with individuals known to be involved in child sex tourism and that her daughter, [I.C.], was a minor and a believed victim of webcam child sex tourism.   (*Id.* ¶ 16.)

[Special Agent Casey] Maxted's [("SA Maxted")] affidavit in support of the warrant to search the previously seized devices stated that Defendant's PayPal account paid $102,633.80 to Santos's account from January 20, 2012 through August 18, 2014 for "no apparent business purpose" according to PayPal.   (*Id.* ¶ 14.)   SA Maxted later determined that the figure was incorrect.   In fact, Defendant had sent Santos approximately $2,500.   (Maxted Hr'g Test. at 7.)

The FBI had learned Defendant had a Skype account registered to wmeyer2@mchsi.com.   The full user name is "prettyvirginfilipino" and is registered to an "[I.] Meyer."[1]   (Ex. D ¶ 17.)   The FBI had also obtained

_____

[1] The first name on defendant's Skype account appears to be a variation of I.C.'s first name.

information showing Defendant transferred money or attempted transfers to members of the Cruz family and Santos on dates known and unknown but most recently on March 2, 2017. (*Id.* ¶ 15.)

On July [3], 2019, SA Maxted and Iowa Division of Criminal Investigation Special Agent Michael McVey [("SA McVey")] conducted a "knock and talk" interview of Defendant outside his residence in Cedar Rapids where he lives with his wife Lori. [(Doc. 26, at 1)].[2] The interview occurred in SA McVey's vehicle. (*Id.*) Prior to that interview SA Maxted did not attempt to obtain a search warrant because he believed the information he had was stale and he would not be able to obtain a warrant. (Maxted Hr'g Test. at 23.) SA Maxted's report of that interview summarizes the events as follows:

> During the course of the interview, MEYER provided information that provided probable cause for a search warrant. (Note: MEYER's interview is recorded and submitted to the captioned case file.) SA Maxted and SA McVey attempted to get consent to search from MEYER. MEYER declined and left the interview, which was conducted in front of his residence in SA McVey's official vehicle, and returned to his residence.
>
> SA Maxted contacted AUSA Mark Tremmel to advise of the interview and intelligence gathered. It was determined that an exigent circumstance existed and SA McVey and the writer could seize items that could potentially hold evidence of a crime.

(Ex. B.) The interview began at 9:26 a.m. and concluded at 10:09 a.m. SA Maxted testified that he was concerned Defendant was going to destroy evidence. During the interview he repeatedly warned Defendant it was a crime to destroy evidence. (Maxted Hr'g Test. at 65). Defendant repeatedly proposed setting a date to turn items over for inspection. (*Id.*) Thereafter, SA Maxted knocked on the door of Defendant's residence and announced he intended to seize Defendant's devices based on exigence. (*Id.* at 52). SA Maxted did not ask permission to enter.

---

[2] The R&R originally cited the date of the interview as July 2, 2019. This finding was likely transcribed from a typographical error in Exhibit D. (Doc. 26, at 19). The recording and other documents indicate the interview occurred on July 3, 2019. *See, e.g.*, (Ex. A at 0:10).

Because SA Maxted testified to his belief that probable cause was "stale" prior to the interview with Defendant, it is helpful to examine specifically what he learned from the interview that "freshened" up his determination of probable cause. Specifically, SA Maxted testified that he obtained the following new information during the interview:

- Jade Hassan [("Hassan")] is an adult prostitute in the [United States].[3] (Maxted Hr'g Test. at 44.) Prior to the interview, SA Maxted knew that Defendant was acquainted with her and had given her money. Hassan is the "known adult prostitute" referred to in the search warrant affidavit. (Ex. D ¶15.) During the interview, SA Maxted learned that Defendant claimed he had given Hassan money to assist her. (Maxted Hr'g Test. at 45.) He also learned Defendant had not disclosed this money transfer to his wife. (*Id.*)

- [Although SA Maxted knew that defendant had travelled to the Philippines in the past, SA Maxted learned during the interview that defendant] stays with the Cruz family [while in the Philippines].[4] (*Id.* at 46-47.) SA Maxted learned that Defendant sent money to the Cruz family for various necessities, including food, medicine, and school supplies. (*Id.* at 47.)

- [During the interview, defendant told SA Maxted that defendant thought I.C.] was 19 years old. (*Id.*)[5]

---

[3] Defendant objected to the R&R's original finding that Hassan resides in the Philippines. (Doc. 43, at 1). The government agreed with this objection. (Doc. 44, at 1). The record shows that Hassan resides in the United States. (Doc. 26, at 10); (Ex. A at 21:36). Defendant also objects, however, to "any conclusion that law enforcement did not know that [Hassan] was a prostitute until" the interview. (Doc. 43, at 1). Officers did know this information in advance of the interview, (Doc. 38, at 26-27, 46), but the R&R does not contradict this fact. The R&R merely states that SA Maxted learned during the interview that defendant claimed to give Hassan money to assist her and that defendant did not tell his wife about that transfer. Both these facts are accurate. (*Id.*, at 46-47). Thus, no further alteration is necessary beyond correcting Hassan's residence.

[4] Defendant objected to the R&R's original finding that the officers learned for the first time during the interview that defendant had travelled to the Philippines in the past. (Doc. 43, at 1). The government agreed with this objection. (Doc. 44, at 1); *see also* (Doc. 38, at 19, 48, 62). Thus, the Court has altered the R&R accordingly.

[5] The government objected to the R&R's original phrasing of these facts. (Doc. 44, at 1-2). The Court found alteration appropriate to reflect not what defendant believed but simply what

- Prior to the interview, SA Maxted knew that Defendant had sent several thousand dollars to the Philippines. (*Id.* at 48.) However, SA Maxted learned that Defendant had not disclosed this information to his wife. (*Id.*)
- Prior to the interview, SA Maxted did not know Defendant spoke with the Cruz family. (*Id.*) As a result of the interview, SA Maxted learned that Defendant spoke with them on a weekly basis and sometimes several times per week. (*Id.*) SA Maxted learned Defendant had spoken with them in the last week. (*Id.* at 48-49.)
- During the interview, SA Maxted learned Defendant communicated with the Cruz family by cell phone and his desktop computer. He also learned Defendant used Skype to communicate with the Cruz family. (*Id.*)
- Prior to his interview with Defendant, SA Maxted knew about Defendant's Skype account, but had not tied Defendant's Skype account "[I.] Meyer" with the user name "prettyvirginfilipino" to the Cruz family. (*Id.*) During the interview, SA Maxted learned that Defendant had used these accounts to communicate with the Cruz family. (*Id.* at 50.)
- In his interview, Defendant gave an e-mail address different from the one tied to this Skype account and denied using other e-mail addresses. (*Id.* at 10-11.)

Ultimately, SA Maxted testified that the current communications with the Cruz family "freshened" his assessment of probable cause.

After the devices were seized, Defendant signed a form consenting to their search. The Government does not rely on the consent to justify any search or seizure so it does not bear further discussion. That same day, SA Maxted obtained a search warrant that permitted a forensic examination of the previously-seized devices. The forensic examination revealed Defendant's possession of child pornography. On September 9, 2019, a second warrant was issued permitting search of additional devices at Defendant's residence. (Ex. F.) The application for the second warrant relied on information recovered from the devices seized on July 3, including Skype communications showing Defendant and minors engaging in sex acts and displaying their genitals.

(Doc. 34, 2-6) (footnotes and alterations added, original footnotes omitted).

---

he told SA Maxted.

## IV. ANALYSIS

In his objections, defendant argues that Judge Roberts erred in concluding (1) that probable cause existed for the officers to enter defendant's home and seize his electronic devices, (2) that the exigency here was not improperly created by the officers, and (3) that the good faith exception from *United States v. Leon*, 468 U.S. 897 (1984), applies even if the searches and seizures here were improper. (Doc. 43). The Court will address each argument in turn.

### A. Probable Cause

Defendant objects to the R&R's finding that probable cause supported both the officers' entry into his home to seize his electronic devices under the exigency exception to the warrant requirement and the subsequent July 3, 2019 warrant to search such devices. (Doc. 43, at 2-5).[6] Defendant asserts that the information officers possessed before the interview was stale and was not freshened by the interview. Defendant argues that he provided legitimate explanations for his personal and financial associations with the Philippines and the Cruz family. Because officers did not obtain any new information that defendant was involved in child exploitation or pornography, defendant concludes that probable cause was not present to support either the officers' entry into his home or the subsequent warrant to search the seized devices.

Under the Fourth Amendment, probable cause is an objective analysis based on the totality of the circumstances known to the officer at the time of the search or seizure. *Whren v. United States*, 517 U.S. 806, 813 (1996). The facts known by the officer must

---

[6] Defendant also objects to the R&R's finding that defendant did not argue the first warrant lacked probable cause. (Doc. 43, at 2) (citing Doc. 34, at 6, 9, 18)). Although this argument was not raised in his motion or brief, defendant notes that it was raised at the hearing. (*Id.*) (citing Doc. 38, at 79-80). Despite the R&R's finding on this issue, Judge Roberts never held that defendant's argument was waived and in fact analyzed whether probable cause was present in the context of exigency. (Doc. 43, at 12-14). Thus, to the extent necessary, the Court finds that defendant's argument that the warrant lacks probable cause has not been waived.

be "sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *United States v. Henderson*, 241 F.3d 638, 648 (9th Cir. 2000). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

There is no dispute here that officers considered their information on defendant's alleged criminal conduct stale before the interview. (Doc. 38, at 24). Officers knew before the interview (1) that Santos, the Cruz family, and others were involved in child exploitation and the international distribution of child pornography, (2) that defendant had sent a significant sum of money to Santos from January 2012 to August 2014, (3) that defendant had sent or attempted to send money to the Cruz family as recently as March 2017, (4) that defendant had travelled to the Philippines in the past, and (5) that defendant had a Skype account registered to wmeyer2@mchsi.com with the username prettyvirginfilipino and profile name [I.] Meyer. (Doc. 34, 2-3).

During the interview, officers learned (1) that defendant had given money to a local adult prostitute for what he claimed was financial support and that he did not disclose such payment to his wife, (2) that defendant admitted to knowing the Cruz family, including I.C., (3) that defendant claimed he thought I.C. was 19-years-old, (4) that defendant stays with the Cruz family when he visits the Philippines, (5) that defendant claimed his payments to the Cruz family were merely financial support and that he did not disclose at least some of these payments to his wife, (6) that defendant spoke with the Cruz family on a weekly basis and sometimes even multiple times per week, (7) that defendant had contacted the Cruz family within the last week, (8) that defendant used both his phone and computer to contact the Cruz family, (9) that defendant used Skype to talk with them, (10) that defendant's Skype username and profile name were tied to

the Cruz family (*id.*, at 4-5), and (11) that defendant's wife never participated in any communications with the Cruz family via Skype (Ex. A at 27:52).

The Court finds that probable cause was present to support both the officers' entry into defendant's home and the subsequent search warrant. As defendant points out, the primary defect with the information possessed by the officers before the interview was its staleness. The officers here were not aware of any recent contact or financial transactions between defendant and other parties known to be involved in international child exploitation and pornography. Indeed, the interview did not produce any further information about financial transactions. It did, however, illuminate defendant's recent and substantial contact with the Cruz family under suspicious circumstances.

Defendant told the officers that he was in frequent contact, as recently as last week, with the Cruz family, whom the officers knew to be involved in child sex tourism. Defendant even stated that he stays at their house when in the Philippines. Although it may not be unusual to stay with friends when overseas, this shows that defendant had strong, personal contact with the Cruz family. Defendant also told the officers that he had sent the Cruz family a substantial sum of money for what he claimed was financial support. Although defendant explained that he gave the Cruz family money for basic necessities, it is notable that defendant claimed similar charitable motives for his transactions with an alleged local prostitute.[7] Defendant could not logically explain how his relationship with this alleged prostitute began. (Ex. A at 22:00, 23:47). Importantly, defendant did not disclose his transactions with the prostitute or the Cruz family to his wife. Defendant's wife also never participated in any Skype communications with the Cruz family, if she ever communicated with them at all. Officers were rightly suspicious that defendant admitted to transferring large sums of money to multiple persons involved in different types of illegal sex work purely for

---

[7] Defendant also cited altruism to explain transactions with another woman. (Ex. A at 25:32).

charitable purposes without ever telling his wife.  Officers were also rightly suspicious that defendant was in regular contact across multiple platforms with persons tied to child exploitation and pornography on a weekly basis to the exclusion of his wife. Compounding too is defendant's denial of contact with other parties associated with child exploitation and pornography, whom the officers knew defendant had sent money to in the past.

Defendant's responses to questions about his email were also suspicious.  When asked what email accounts he used, defendant initially responded "wmeyer2" and then corrected himself and said "wmeyet2@gmail.com."  (Ex. A at 12:20).  Defendant was asked twice if he had or used other emails and he replied no both times.  (*Id.*, at 12:45, 13:12).  Defendant stated that his Skype account was tied to his wmeyet2@gmail.com address.  When SA Maxted told defendant his records showed the email as "wmeyer2," defendant explained that he incorrectly spelled his name when setting up the email address.  It is odd at best that someone would misspell their own name in an email address and continue to use the account instead of setting up a new one.  Despite being asked about this "wmeyer2" address, defendant still did not mention his wmeyer2@mchsi.com email which the officers knew was linked to defendant's Skype account that he used to communicate with the Cruz family.  (*Id.*, at 16:00).  It is likely defendant still used this email since he admittedly contacted the Cruz family over Skype as recently as last week.  Even if the Court assumes that defendant did have an email called wmeyet2@gmail.com and that he no longer used the wmeyer2@mchsi.com address, his responses are still suspicious and evasive here.

Also relevant to probable cause is the identifying information on defendant's Skype account.  After defendant admitted to using Skype to communicate with the Cruz family, the officers were able to link the username (prettyvirginfilipino) and the profile name

([I.] Meyer) to the Cruz family. These names reasonably suggest that the account may have some type of sexual purpose and be related to I.C.

The totality of this new information freshened the information already possessed and would warrant a prudent person in believing that defendant was involved in child exploitation and pornography. *See Whren*, 517 U.S. at 813; *Henderson*, 241 F.3d at 648. Therefore, probable cause was present to support both the officers' entry into defendant's home and the subsequent warrant to search the devices.

Thus, the Court **overrules** defendant's objections on this issue and **adopts** Judge Roberts' R&R without modification.

### B.    *Exigency*

Defendant objects to the R&R's finding that the officers did not improperly create the exigency here that purportedly excused their entry into defendant's home. (Doc. 43, at 2, 3-4). Specifically, defendant asserts that the officers created the exigency by choosing to perform a knock-and-talk interview.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks omitted)). Indeed, "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. Dist. Ct. of Mich., S.D.*, 407 U.S. 297, 313 (1972) (internal quotation marks omitted)). When a warrantless entry and search is conducted in a home, the government bears the burden of proving that an exception to the warrant requirement applies. *United States v. Selberg*, 630 F.2d 1292, 1294 (8th Cir. 1980).

Exigency is a recognized exception to the warrant requirement. *Kleinholz v. United States*, 339 F.3d 674, 676 (8th Cir. 2003). "The exigent circumstances exception

justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Ramirez*, 676 F.3d 755, 759 (8th Cir. 2012) (quoting *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996) (alteration omitted)). "When the exigency at issue is destruction of evidence, police officers must demonstrate a sufficient basis for an officer to believe that somebody in the residence . . . will immediately destroy evidence." *Id.*, at 760 (citing *United States v. Clement*, 854 F.2d 1116, 1119 (8th Cir. 1988)). "The risk that evidence will be destroyed during the time required to obtain a search warrant can be an exigent circumstance that justifies a warrantless entry." *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005). Further, exigency must be accompanied by probable cause. *Kleinholz*, 339 F.3d at 676.

The Court finds that exigency was present here. Following the interview, defendant was fully aware of the officers' investigation. With this knowledge, defendant refused to allow the search of his electronic devices, as is his right. Instead of invoking his rights though, defendant made a variety of excuses to the officers; that he used the devices too frequently to turn them over, that his house was too messy to allow the officers inside, that the officers' requests were too ambiguous, and so on. (Ex. A at 28:36–42:28). At several points, defendant offered to turn over his devices on a later date or requested time alone with them before the search. (*Id.*, at 29:48, 32:16, 33:09). Both officers repeatedly expressed their concerns about spoliation. Moreover, SA Maxted informed defendant that if defendant did not consent to a search that day, the officers would return with a search warrant. (*Id.*, at 31:42). At this time, the officers had probable cause to believe that defendant's devices would contain evidence of child exploitation and pornography. Defendant, after giving the officers that probable cause, was in custody of those devices with full knowledge that he was the subject of an FBI investigation. Defendant's repeated requests to turn over the devices later or have time

alone with them posed a real risk of spoliation which was not effectively mitigated by the officers' warnings. Under these circumstances, it was reasonable for the officers to believe that defendant would destroy his electronic devices or delete the evidence therein before a search warrant could be obtained.

The more nuanced question is whether police created this exigency. Under the police-created exigency doctrine, an exception to the exigent circumstances rule, "police may not rely on the need to prevent destruction of evidence when that exigency was created or manufactured by the conduct of the police." *Ramirez*, 676 F.3d at 760-61 n.3 (quoting *Kentucky v. King*, 563 U.S. 452, 461 (2011) (internal quotation marks omitted)). In *United States v. Ramirez*, the Eighth Circuit Court of Appeals held in discussing this exception that "when the police knock on a door but the occupants choose not to respond or speak, or maybe even choose to open the door and then close it, or when no one does anything incriminating, the officers must bear the consequences of the method of investigation they've chosen." 676 F.3d at 758. "[I]n some sense the police always create the exigent circumstances that justify warrantless entries and arrests. But the police do not necessarily act impermissibly any time they create an exigency in a strict causal sense." *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1005 (8th Cir. 2010). Thus, courts must determine "the reasonableness and propriety of the investigative tactics that generated the exigency." *Id.* "Where . . . the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent destruction of evidence is reasonable and thus allowed." *King*, 563 U.S. at 462.

The Court finds that the exigency here was neither created nor manufactured by the officers. "Police officers regularly rely on a knock-and-talk as an investigative strategy when they do not have enough evidence to obtain a search warrant." *Cisneros-Gutierrez*, 598 F.3d at 1006. In *United States v. Cisneros-Gutierrez*, the Eighth Circuit

Court of Appeals held that the knock-and-talk investigation at issue "was a reasonable and proper investigative strategy that did not foreseeably increase the likelihood of the destruction of evidence." *Id.* (upholding the officers' entry into a private residence during a knock-and-talk after observing another individual in the residence appear to dispose of drugs down a sink). This tactic is unlike tactics in other cases where the destruction of evidence was the "probable result." *Id.*, at 1005 (citing *United States v. Duchi*, 906 F.2d 1278, 1285 (8th Cir. 1990) (finding that the officers' tactic of allowing the suspect to pick up and return home with a package of cocaine did not justify entry into the suspect's home because officers created a scenario where the destruction of evidence was probable) (abrogated in part)). Although the court acknowledged that "destruction of evidence is a possible result of a knock-and-talk, other likely results include the grant of consent to a search, the demand for a warrant for police entry, or a consensual conversation with the resident outside the home." *Id.*, at 1006.

In *United States v. Camberos-Villapuda*, a consensual conversation between the law enforcement officers and the defendant occurred outside the defendant's home. No. CR. 13-40104, 2014 WL 12665782, at *2 (D.S.D. Aug. 22, 2014). There, officers suspected the defendant was involved in the distribution of drugs but did not have enough evidence to obtain a search warrant and thus elected to speak with the defendant in his backyard. *Id.*, at *1-2. The defendant appeared nervous, gave conflicting information, and was in possession of tools consistent with drug trafficking. *Id.*, at *2-3. Upon learning that other individuals were present in the residence, officers entered the home under exigency to perform a protective sweep both for officer safety and to prevent destruction of evidence. *Id.*, at *3. The court found that officers did not create the exigency by interviewing the defendant, that this intrusion was proper, and that their securement of the premises pending a search warrant was justified. *Id.*, at *5-6. In reaching its conclusion, the court noted "that general investigatory procedures, such as

when agents visit a residence with the intention of questioning a suspect, qualify as a legitimate law enforcement objection." *Id.*, at \*4 (quoting *United States v. Gonzalez*, 441 Fed. App'x 404, 406 (8th Cir. 2011)).

Here, officers conducted a standard knock-and-talk with defendant, which is a common and accepted police tactic. Defendant voluntarily spoke with the officers, during which time the officers developed probable cause that defendant was involved in child exploitation and pornography. Defendant's continued requests to turn over his electronic devices later or to at least have time alone with them before the search gave the officers a reasonable basis to conclude that defendant would destroy evidence on those devices if given the opportunity. Thus, the officers seized defendant's devices and waited for a warrant to search them. The Court finds that although this tactic created the possibility of a scenario where defendant would be prompted to destroy evidence, such a scenario was not the probable result. *See Cisneros-Gutierrez*, 598 F.3d at 1006. Instead, as a result of their consensual conversation with defendant, officers made a limited intrusion only to the extent necessary to protect evidence. *See Camberos-Villapuda*, 2014 WL 12665782, at \*6. The Court finds this tactic appropriate in light of the fact that the officers could not have obtained a search warrant earlier based on their previously stale information. *See id.*, at \*2. Defendant's suggestion that the officers could have secured his home while obtaining a warrant is immaterial. (Doc. 43, at 4). In either case, the officers' conduct here was a measured intrusion based on probable cause developed during an appropriate investigative procedure. On these facts, the Court concludes that the officers acted properly and did not create or manufacture the exigency here.

The Court also finds that the officers here did not engage or threaten to engage in any conduct that violates the Fourth Amendment. Defendant argues that SA Maxted threatened to violate his Fourth Amendment rights by telling "[d]efendant that if he did

not provide consent to search his [devices] that they would do so whenever they wanted." (Doc. 43, at 4). SA Maxted told defendant that he would get a search warrant if defendant did not allow the officers to search defendant's devices. (*Id.*, at 31:42). At the end of the interview, defendant suggested the officers get a warrant. (*Id.*, at 41:40). Defendant then again offered to turn over the devices if given a specific time to do so. (*Id.*, at 42:30). SA Maxted replied "I'm not gonna tell you when I want it, I'll come over, I'll knock on the door, and . . . we'll go from there." (*Id.*, at 42:32) (pause represented by ellipses). The context shows that SA Maxted was merely stating that the search warrant process would not be scheduled at defendant's convenience. SA Maxted's statement reflects his frustration at defendant's continued instance that he would turn over the devices later despite the risk spoliation, but it is a far cry from a threat to violate defendant's constitutional rights. In other words, officers merely telling a suspect that the suspect will not have advanced notice of a lawful search is not a threat and does not violate the suspect's Fourth Amendment rights.

Thus, the Court **overrules** defendant's objections on this issue and **adopts** Judge Roberts' R&R without modification.

### C. *Good Faith*

Last, defendant objects to the R&R's alternative finding that the *Leon* good faith exception saves the two search warrants issued after his July 3, 2019 interview with the officers. Defendant asserts that a reasonable officer would not have concluded that defendant's interview provided probable cause. (Doc. 43, at 5). Although defendant acknowledges the interview gave law enforcement some new information, he contends such information did not tie him or his electronic devices to child exploitation or pornography. (*Id.*).

In *Leon*, the Supreme Court "created the good-faith exception to the exclusionary rule." *United States v. Johnson*, 78 F.3d 1258, 1261 (8th Cir. 1996) (citing *Leon*, 468

U.S. at 922).  In explaining the need to create a good faith exception to the exclusionary rule, the Supreme Court reasoned that:

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.  In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.  Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.  Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

*Leon*, 468 U.S. at 921 (alteration, citation, and internal quotation marks omitted).  Under *Leon*'s good-faith exception, the Fourth Amendment exclusionary rule is not to "be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid."  *United States v. Taylor*, 119 F.3d 625, 629 (8th Cir. 1997) (citing *Leon*, 468 U.S. at 905, 922-23).  "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."  *Leon*, 468 U.S. at 916.

The Eighth Circuit Court of Appeals has outlined four circumstances when an officer's reliance on a warrant would be unreasonable: (1) the officer's affidavit included information the officer knew was false or should have known was false; (2) the affidavit is so lacking in probable cause such that the officer's reliance was objectively unreasonable; (3) the judge failed to act in a neutral and detached manner; or (4) the warrant is so facially deficient that the officer cannot reasonably presume it to be valid.  *See United States v. Phillips*, 88 F.3d 582, 586 (8th Cir. 1996) (citing *Leon*, 468 U.S. at 922).

None of these scenarios apply here.   As discussed above, the Court finds that the interview did provide probable cause to believe defendant was involved in child exploitation and pornography and that evidence of such involvement would be present on his electronic devices.   Even if probable cause was not met, however, officers possessed sufficient information such that it was reasonable for them to believe probable cause existed.   Therefore, suppression here would not further the goal of deterring police misconduct.

Thus, the Court **overrules** defendant's objections on this issue and **adopts** Judge Roberts' R&R without modification.[8]

## V.   CONCLUSION

For these reasons, the Court **sustains in part** and **overrules in part** defendant's objections (Doc. 43), **sustains** the government's objections (Doc. 44), **adopts** Judge Roberts' R&R (Doc. 34) with modification, and **denies** defendant's motion to suppress (Doc. 25).

**IT IS SO ORDERED** this 12th day of February, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[8] Defendant also objects to the R&R's finding that evidence obtained as a result of the officers' seizure and search of defendant's devices need not be suppressed as fruit of the poisonous tree. (Doc. 43, at 4-5) (citing Doc. 34, at 19).   Because the Court has found the seizure and search proper here, any evidence resulting from them is not tainted by any constitutional violation. Thus, suppression is also not warranted on this basis.